**In re: OPERATION OF THE MISSOURI RIVER SYSTEM Litigation**

**No. 03–MD–1555(PAM).**

United States District Court, D. Minnesota.

June 21, 2004.

Daniel H. Israel, Boulder, CO, Lisbeth Jane Nudell, Nudell Law Office, Mpls, MN, David D. Cookson, Jon C. Bruning, Nebraska Atty General's Office, Donald G. Blankenau, Thomas R. Wilmoth, Fennemore Craig PC, Lincoln, NE, for Intervenor Plaintiffs.

Anne E. Mahle, Brian Boru O'Neill, Peter C. Hennigan, Richard A. Duncan, Faegre & Benson, Mpls, MN, Cassandra Sturkie, David A. Becker, David J. Hayes, Janice M. Schneider, Julia A. Hatcher, Latham & Watkins, Sam Kalen, Van Ness Feldman PC, Timothy D. Searchinger, Environmental Defense, Washington, DC, for Defendants.

James A. Maysonett, US Dept of Justice, Washington, DC, for Cross Defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the Court on various Motions for Summary Judgment. This case arises out of the management of the Missouri River, which flows from Montana to Missouri. Pursuant to the Flood Control Act of 1944 ("FCA"), the United States Army Corps of Engineers ("Corps") manages the river and its reservoirs. In conjunction with its responsibilities under the FCA, the Corps developed a more detailed management plan, the "Missouri River Main Stem Reservoir System Master Water Control Manual" ("Master Manual"). The Master Manual was first developed forty years ago, and has been revised three times, in 1973, 1975 and 1979. In the late 1980s, the Corps began to revise the Master Manual again. Finally, after fifteen years and repeated delays, the Corps issued a revised Master Manual on March 19, 2004.[1] The Corps also issued the 2004 Annual Operating Plan ("AOP") on March 19, 2004.

Over the last several years, the Missouri River has experienced prolonged drought conditions. The Corps has been forced to make difficult decisions regarding the allocation of water to the different interests in the basin. As a result, interested parties filed lawsuits in various districts, seeking to protect their interests. *See American Rivers v. U.S. Army Corps of Eng'rs*, File No. 1:03–241 (D.D.C.); *Nebraska v. Ubbelohde*, 8:02–217 (D.Neb.); *Blaske Marine*,

---

[1] Revision of the Master Manual is an extensive and lengthy process that requires the Corps to consult with various agencies and comply with various regulations and procedures. Prior to the issue of the new Master Manual, the Corps must issue a Final Environmental Impact Statement ("Final EIS"), and allow 30 days for public review and comment as required by the National Environmental Policy Act ("NEPA"). Here, the Court shortened the NEPA review period to two weeks and required the Corps to issue a revised Master Manual on March 19, 2004. On March 1, 2004, the Corps requested a waiver of the NEPA review period, which the Environmental Protection Agency ("EPA") granted "for compelling reasons of national policy." From the outset, the Court refuses to entertain any Motions attacking the sufficiency of the NEPA review period and dismisses all claims pertaining to this issue.

*Inc. et al. v. Norton,* File No. 8:03–142 (D.Neb.); *North Dakota v. Ubbelohde,* File No. 1:02–59 (D.N.D.); *South Dakota v. Ubbelohde,* File No. 3:02–3011 (D.S.D.). In July 2003, the multi-district litigation panel consolidated these actions and transferred them to this Court. *In re Operation of the Missouri River Litig.,* File No. 03–1555(PAM). Pursuant to the Court's scheduling order and as a result of the coordinated efforts of the parties, the issues presented in these various cases are now before this Court. This Memorandum and Order disposes of all claims before the Court.

## BACKGROUND

### A. The Parties

The parties involved in this action include: (1) the states of North Dakota, South Dakota, Montana, Nebraska, and Missouri; (2) Blaske Marine, Coalition to Protect the Missouri River, ConopcoPhillips Company, Ergon Asphalt & Emulsions, Inc., Magnolia Marine Transport Company, Midwest Area River Coalition 2000, and Midwest Terminal Warehouse Company, Inc. (collectively "Blaske Marine"); (3) MO–ARK Association and Missouri River Keepers (collectively "MO–ARK"); (4) American Rivers, Environmental Defense, National Wildlife Federation, various state Wildlife Federations, and Izaak Walton League of America (collectively "American Rivers"); (5) Missouri River Energy Services ("MRES"); (6) Nebraska Public Power District ("NPPD"); (7) the Mandan, Hidasta and Arikara Nation ("the Nation"); and (8) the Corps, Fish and Wildlife Service ("FWS"), and various directors, secretaries and officers of these two government agencies (collectively "Federal Defendants"). Because of their competing interests, it is difficult to classify each party as a Plaintiff, Defendant, or both. Rather, the claims can be categorized into four different topics: (1) Flood Control Act ("FCA") claims; (2) Endangered Species Act ("ESA") claims; (3) NEPA claims; and (4) collateral claims. The Court will address each topic in turn.

### B. The Revision of the Master Manual

In 1990, pursuant to the Endangered Species Act ("ESA"), the Corps conducted its first consultation with the FWS on the effects of its Missouri River operations on endangered and threatened species.[2] In 2000, the Corps again consulted with the FWS. Following these consultations, the FWS issued the 2000 Biological Opinion ("2000 BiOp"), that concluded that the Corps' proposed river operations for 2000 were likely to jeopardize three species: the endangered least term, the threatened piping plover, and the endangered pallid sturgeon. (Fish and Wildlife Service Administrative Record ("FWS AR") 1237 at 29216–17.) The 2000 BiOp included a Reasonable and Prudent Alternative ("RPA"), designed to avoid jeopardy to the tern, plover and sturgeon. Specifically, this RPA recommended a spring rise and low summer water flow regime, in conjunction with habitat construction, to avoid jeopardy. (*Id.* at 29229–32.)

In April 2003, the Corps consulted with the FWS again on the Corps' proposed operations for 2003. The FWS then issued a supplemental Biological Opinion, concluding that although the proposed operations for 2003 deviated from the RPA in the 2000 BiOp, the proposed operations were justified. The District Court of the District of Columbia disagreed, and granted a preliminary injunction ordering the

---

**2.** An endangered species is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

Corps to comply with the 2000 BiOp. *See American Rivers v. U.S. Army Corps of Eng'rs,* 271 F.Supp.2d 230 (D.D.C.2003). In November 2003, the Corps again consulted with the FWS. The FWS then amended the 2000 BiOp. (2003 Amended Biological Opinion (hereinafter "2003 Amended BiOp") at FWS AR 1457.) The FWS again concluded that jeopardy would result to the plover, tern and the sturgeon, and proposed a new RPA. The 2003 RPA contained three separate parts, each part applicable to a single species.

As noted above, the Corps issued the 2004 Master Manual on March 19, 2004. The 2004 Master Manual, along with the 2004 AOP, are based on the 2003 Amended BiOp. In accordance with NEPA, the Corps issued the Final EIS for the 2004 Master Manual on March 5, 2004. This Court truncated the public comment and review period for the 2004 Master Manual. Therefore, on March 19, 2004, pursuant to Court Order, the Corps issued the 2004 AOP, 2004 Master Manual, and Record of Decision ("ROD"). The issues in this litigation involve both the substance of the 2004 Master Manual and the procedures the Corps used to formulate the 2004 Master Manual.

## DISCUSSION

This case involves the interplay of the Corps' obligations under the FCA, ESA and NEPA. The FCA authorizes the Corps to operate the Missouri River by balancing a variety of river interests. The ESA seeks to protect and conserve endangered and threatened species and their habitats. NEPA requires agencies to consider and evaluate the potential environmental consequences that may result from an agency action. The Corps must consider both competing river interests and its legal obligations in the operation of the Missouri River.

## A. The Flood Control Act of 1944

### 1. *Navigation and Flood Control*

The FCA provides for the management of the Missouri River and its reservoirs. Pub.L. No. 78–534, 58 Stat. 887 (1944). The FCA is the product of the "Pick–Sloan" plan. The "Pick" Plan, submitted to Congress by the Corps, proposed the construction of reservoirs to effectively control flooding, but also acknowledged that "[t]he development of such a comprehensive plan involves adjustment of many factors of flood control, navigation, irrigation, hydroelectric power production and numerous other functions of water conservation and management." H.R. Doc. No. 78–475 at 6 (1944). The "Pick" Plan did not rank any river interest above another, but rather seeks to provide the "widest range of multiple benefits" and "to contribute most significantly to the welfare and livelihood of the largest number of people." *Id.* at 7. The "Sloan" Plan, submitted to Congress by the Bureau of Reclamation, proposed the construction of reservoirs "for the purposes of storing water, and releasing it during periods of low flow ... [s]uch reservoirs will contribute to flood control ... aid navigation ... enlarge the supply of water available for irrigation ... and ... make practicable the generation of electrical energy." S. Doc. No. 78–191 at 18 (1944). The "Sloan" Plan does not dictate a priority of river interests, but rather seeks to provide a "basin-wide plan most likely to yield the greatest good to the greatest number of people." *Id.* at 17. The "Sloan" Plan declared that any plan for operation of the river must "recognize all beneficial uses of waters, weigh their relative values, and make a compromise, from a basin-wide viewpoint, in each instance of conflict." *Id.* at 21. These two plans combined to develop one plan for the river's operation, the "Pick–Sloan" Plan. S. Doc. No. 78–247 (1944). This "unified"

plan was intended to "secure the maximum benefits for flood control, irrigation, navigation, power, domestic and sanitary purposes, wildlife, and recreation" in the Missouri River. *Id.* at 5; *see id.* at 2.

■ Courts acknowledge that the "dominant" functions of the FCA include flood control and downstream navigation, but they also acknowledge that other river interests should similarly be provided for. *ETSI Pipeline Project v. Missouri,* 484 U.S. 495, 512, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988); *see also South Dakota v. Ubbelohde,* 330 F.3d 1014, 1019–20 (8th Cir. 2003). The Eighth Circuit acknowledged that the FCA requires that "the Corps must strike a balance among many interests, including flood control, navigation and recreation." *Ubbelohde,* 330 F.3d at 1019, 1027. The Corps' obligations under the ESA are within the scope of these "many interests." *See American Rivers,* 271 F.Supp.2d at 252. Because of this balance, the Court may only review the Corps' actions to ensure that the Corps considered all river interests when formulating a given plan. *Id.* at 1027. The language of the FCA does not require a particular outcome, but rather that the Corps consider all interests in its operations. *Id.* There is no language in either caselaw or legislative history that dictates that the Corps must always maintain a particular water level or specific water season in its river operations. All river interests must be considered and evaluated to "secure the maximum benefits" to river interests. The Court finds that the FCA does not impose a non-discretionary duty to maintain minimum navigation flows or season lengths. The Corps' prioritization of river interests is discretionary.

However, the Corps is not entitled to abandon these interests; it must consider and balance river interests to achieve maximum benefits. Some parties propose that navigation is abandoned under the 2004 Master Manual, because in the event that by March 15 total system storage is below 31 million acre-feet, the 2004 Master Manual provides that flows be reduced such that the navigation season is eliminated for that particular water year. As the Corps points out, however, the FCA requires it to defer to upstream consumptive uses in the event these uses "conflict" with downstream navigation. *See* 33 U.S.C. § 701–1(b). In the rare event that this condition presents itself, the 2004 Master Manual's elimination of the navigation season ensures that upstream consumptive uses are given deference as required by law. The Court finds that the 2004 Master Manual complies with the FCA.

The priority that the Corps gives the competing river interests is a discretionary function, and subject to the ESA. If Congress intended to require that the Corps always maintain minimum levels of navigation or a specific navigation season, then Congress must amend the FCA accordingly. Absent any evidence to the contrary, the Court concludes that prioritization of river interests is discretionary.

### 2. Ambiguity of the Master Manual

■ *South Dakota v. Ubbelohde* declared that the 1979 Master Manual limited the Corps' discretion to operate the Missouri River. 330 F.3d at 1029. As a result, *Ubbelohde* found that judicial review of the Corps' decisions was appropriate. *Id.* In reaching that conclusion, the Eighth Circuit relied on a combination of three considerations: (1) the language of the manual itself; (2) the corresponding agency regulations at 33 C.F.R. § 222.5; and (3) the Corps' treatment of the manual. *Id.* (citing *Northwest Nat'l Bank v. Dep't of the Treasury,* 917 F.2d 1111, 1116–17 (8th Cir.1990)). Unlike the 1979 Master Manual, the 2004 Master Manual expressly states that "the Master Manual

has been amended to clearly reflect the Corps' intent that it not be considered a binding regulation." (2004 Master Manual, at Introduction.) The Corps essentially is attempting to reserve the right to vary operations from those set forth in the Master Manual, in the event that changed conditions or unforeseen circumstances require it to do so. The Corps insists that the FCA, its regulations, and the *Ubbelohde* decision permit it to retain such discretion in its operations. Missouri, Nebraska, and the NPPD insist that this discretion is expressly prohibited by *Ubbelohde*.

Missouri, Nebraska and NPPD misinterpret the discretion the Corps seeks to retain. The Corps does not intend to disregard the Master Manual and thus operate the River with unfettered discretion. To the contrary, the Corps seeks to retain the discretion to deviate from the 2004 Master Manual in the event that unforeseen circumstances arise. The Corps cannot anticipate and provide for all possible circumstances affecting river operations. Although historical patterns provide some insight into future circumstances, the Corps simply cannot predict the future. If the Corps was prohibited from varying its operations from the Master Manual to adjust for unforeseen circumstances, and instead was required to conform to a Master Manual that did not contemplate a given situation, the Corps would arguably violate its obligations under the FCA and *Ubbelohde* to properly balance river interests.

However, the Court does not construe this discretion to permit the Corps to perpetually evade judicial review. The Eighth Circuit determined that the 1979 Master Manual could serve as a basis for court review. *Ubbelohde,* 330 F.3d at 1029–30. Although the Eighth Circuit made this determination in part by examining the language of the 1979 Master Manual, it also relied on the regulations governing the Corps' promulgation of the Master Manual. Particularly, these regulations "are not the types of procedures one would expect in the promulgation of an internal, non-binding agency guideline." *Id.* at 1029; 33 C.F.R. § 222.5. Therefore, pursuant to *Ubbelohde,* this Court determines that the 2004 Master Manual may likewise serve as a basis for judicial review. The 2004 Master Manual, like the 1979 Master Manual, is binding on the Corps to the extent that the parties may seek judicial review to ensure that the Corps' operations conform to the 2004 Master Manual. The Corps acknowledges that it must abide by the 2004 Master Manual, and that any permanent amendment to the existing provisions of the 2004 Master Manual must go through the procedures contained in 33 C.F.R. § 222.5. (Fed. Defs.' Reply Mem. in Supp. of Mot. on FCA and NEPA at 12.) The Court acknowledges that the Corps must be permitted to vary its operations in the event that changed circumstances require it to do so, but similarly holds that this discretion does not eliminate the propriety of judicial review of the lawfulness of the agency action. Therefore, the 2004 Master Manual satisfies the procedural requirements of *Ubbelohde* and the FCA.

### 3. *Recreational Interests*

■ South Dakota maintains that the FCA subordinates navigation to upstream uses of irrigation and domestic water supply. The "O'Mahoney–Millikin Amendment," 33 U.S.C. § 701–1(b) states:

> The use for navigation, in connection with the operation and maintenance of such works herein authorized for construction, of waters arising in states lying wholly or partly west of the ninety-eighth meridian shall be only such use as does not conflict with any beneficial consumptive use, present or future, in States lying wholly or partly west of the

ninety-eighth meridian, of such waters for domestic, municipal, stock water, irrigation, mining or industrial purposes. This provision requires that when a conflict between upstream consumptive uses and downstream navigation exists, upstream consumptive uses receive deference. South Dakota does not argue that the 2004 Master Manual does not serve these consumptive uses. Rather, South Dakota argues that the 2004 Master Manual is in "conflict" with South Dakota's consumptive beneficial uses, because the 2004 Master Manual allows for lower levels in reservoirs such that South Dakota may be required to build extensions to irrigation lines or extend intake structures for drinking water at these reservoirs.

South Dakota's argument lacks merit. The statute is not designed to protect against these kind of difficulties, but rather designed to "prohibit destruction of state-created water rights without any compensation at all, by the assertion of an overriding federal easement for navigation." *Turner v. Kings River Conservation Dist.*, 360 F.2d 184, 192 (9th Cir.1966) (interpreting 33 U.S.C. § 701–1). Moreover, requiring South Dakota to build extensions for irrigation lines or drinking water is not in "conflict" with South Dakota's consumptive beneficial uses, because there is no destruction or denial of South Dakota's water rights. *Kansas v. United States*, File No. 00–4153, 2000 WL 1665260 (D.Kan. Sept.29, 2000) (finding that mere "potential threat" that Corps' drainage of water from three reservoirs would deny adequate drinking water or interfere with industrial purposes insufficient to constitute "conflict" with Corps' actions). In fact, the 2004 Master Manual sets forth the minimum levels required to be maintained in the upstream reservoirs, and a "safety cushion" that ensures that these reservoir levels are maintained even under drought conditions. (*See* 2004 Master Manual, §§ VII–10 to VII–11 & Table VII–3.) The 2004 Master Manual complies with the FCA.

### 4. *Conclusion*

The Corps' Motion for Summary Judgment on FCA claims is granted. Motions by South Dakota, Nebraska, NPPD, Missouri and Blaske Marine Plaintiffs are denied.

### B. The Endangered Species Act and Related Claims

The ESA seeks "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation of such ... species." 16 U.S.C. § 1531(b). The ESA prohibits any person, including federal agencies, to "take" a listed endangered species. 16 U.S.C. § 1538(a)(1)(B). "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19).

In the event that its proposed action may jeopardize a listed species, the Corps must prepare a "biological assessment" evaluating both the species in the action area as well as the potential effects the proposed action may have on the species in the action area. *See* 50 C.F.R. § 402.02 (defining biological assessment). A proposed action will "jeopardize" the species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.* If the Corps concludes that its proposed actions may adversely affect the listed species, then it must initiate consultation with the FWS. This consultation is required to "insure" that the Corps' proposed action "is not likely to jeopardize the continued existence of any endangered or threatened species

or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2).

After this consultation, the FWS must prepare and issue a Biological Opinion ("BiOp") to the Corps. 16 U.S.C. § 1536(b)(3). The BiOp must set forth the FWS's opinion, with supporting information, detailing how the Corps' proposed actions will affect the species. 16 U.S.C. § 1536(b)(3)(A). In the event that the FWS concludes that jeopardy to the species will result, the FWS must also set forth a RPA. *Id.* A RPA is an alternative action "that can be implemented in a manner consistent with the intended purpose of the action," within the Corps' legal authority. 50 C.F.R. § 402.02. A RPA must also be economically and technologically feasible for the Corps to implement. *Id.* The RPA is designed to avoid the likelihood of jeopardizing the continuing existence of the species. *Id.* If the FWS concludes that either the Corps' proposed action or the implementation of a RPA may still result in an incidental take of the species, the FWS must also include an Incidental Take Statement ("ITS") in the BiOp. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i) (setting forth requirements for ITS). An incidental take statement identifies the impact that the take will have on the species, identifies "reasonable and prudent measures" ("RPM") considered necessary to minimize the impact, and sets forth the terms and conditions required to implement the RPMs. *Id.* If the Corps' action is otherwise in compliance with the terms and conditions set forth in the ITS, any action that harms a listed species will not be considered a "take" under the ESA. 16 U.S.C. § 1536(*o*).

Because the ESA makes no specific provision for judicial review of final agency actions, the scope of the review is governed by the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.* The Court reviews an agency action to determine if it was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). If the agency decision fails to articulate a satisfactory explanation for its conclusions, relies on factors which Congress did not intend for it to consider, or fails to consider an important aspect of the problem, that decision is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Under this standard, the Court's review is narrow, evaluating whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment. *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).[3] The Court should defer to the agency so long as the agency's interpretation of the evidence was reasonable. *Id.* The Court may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Vole,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

### 1. *Claims by American Rivers*

American Rivers contends that the Corps should maintain river operations pursuant to the 2000 BiOp. As a result of the 2000 ESA consultations, the FWS issued the 2000 BiOp that concluded that the Corps' proposed operations would cause

**3.** American Rivers and other parties argue that Federal Defendants are subject to a heightened standard of review, because the 2003 Amended BiOp is a "reversal" of the 2000 BiOp. The Court disagrees. The law does not require that Federal Defendants provide

extensive justification for the Corps' decision. Rather, the decision must be "rational," providing "permissible reasons" for the change. *American Rivers v. U.S. Army Corps of Eng'rs,* 271 F.Supp.2d 230, 255–56 (D.D.C.2003).

jeopardy to the tern, plover and sturgeon. The RPA in the 2000 BiOp recommended that the Corps utilize both water flows and habitat construction, among other elements, to avoid jeopardy to the plover, tern and sturgeon. (FWS AR 1237 at 29232.) In November 2003, the Corps and the FWS reinitiated consultation under the ESA. The FWS then issued the 2003 Amended BiOp, which again concluded that the Corps' proposed operations would cause jeopardy to the plover, tern and sturgeon. The 2003 Amended BiOp recommended a multiple species RPA to avoid such jeopardy. The RPA has individual sections allocated to each one of the species. In particular, the 2003 RPA no longer requires both flow modification and habitat construction to avoid jeopardy to the plover and tern. The sturgeon RPA maintains both flow changes and habitat construction, though modified somewhat from the 2000 BiOp RPA.

American Rivers submits numerous arguments challenging the validity of the 2003 Amended BiOp. American Rivers contends that the FWS's elimination of flow changes in the 2003 RPA applicable to the plover and tern is arbitrary and capricious, and that the changes made to the sturgeon RPA are also arbitrary and capricious in violation of the ESA. American Rivers also maintains that the 2003 Amended BiOp violates the ESA because it does not "insure" against jeopardy. As a result, because the Corps fails to follow the 2000 BiOp, American Rivers contends that the Corps' actions "take" the plover, tern and sturgeon in violation of the ESA.

a. *Plover and Tern RPA*

The 2000 BiOp recommended that a spring rise and low summer flow were necessary to avoid jeopardy to all three species. The 2003 Amended BiOp adopts many of the findings and conclusions of the 2000 BiOp, including the general conclusion that flow modifications coupled with habitat construction will prevent jeopardy to the species. (FWS AR 1457 at 33714, 33736.) However, unlike the 2000 RPA, the 2003 RPA eliminates the requirement that both flow modifications and habitat construction are essential to avoid jeopardy to the plover and the tern. Instead, the 2003 RPA contains additional elements, such as a drought conservation plan, Gavins Point dam summer releases, accelerated construction of shallow water habitat, and adaptive management, that together avoid jeopardy to the plover and tern. (FWS AR 1451 at 33187.)

The 2003 Amended BiOp relies on updated information: (1) completion of a report by the National Academy of Sciences' National Research Council, "The Missouri River: Exploring the Prospects for Recovery;" (2) analysis of the reservoir releases pursuant to the 2000 RPA; (3) continued monitoring and study of listed species; (4) use of a new model to better analyze use of reservoir habitat by the tern and plover; and (5) the critical habitat designation of the plover in October 2002. (FWS AR 1291 at 31065.) Particularly relevant to the plover and the tern is the new information relating to the analysis of the 2000 RPA and the continued monitoring of the species since the 2000 BiOp. (*Id.*) Since the 2000 BiOp, both the plover and the tern populations have experienced some improvement. (FWS AR 1457 at 33701, 33704.) Further, analysis of the implementation of the 2000 BiOp RPA indicated that intended habitat objectives could not be achieved, and that in fact, spring and summer flows specified in the 2000 BiOp RPA actually impeded the development of sandbar habitat essential to plover and tern survival. (FWS AR 1457 at 33545.)

█ Elimination and degradation of both plover and tern habitat contribute to the declining status of the species. The 2000 RPA proposed both spring and sum-

mer flows and habitat construction to "restore, maintain, and create sandbar habitat for terns and plovers." (FWS AR 1290 at 31040; *see* FWS AR 1237 at 29230.) However, the Corps sets forth, and the FWS adopts, that the "alluvial geomorphic process" indicated that spring and summer flows would not create sandbar habitat but would potentially destroy beneficial sandbar habitat. (FWS AR 1290 at 31040; FWS AR 1290 at 31067; FWS 1457 at 33545.) Therefore, the Corps proposed, and the FWS agreed, that the elimination of spring and summer flows coupled with the addition of new RPA elements, would continue to avoid jeopardy to the plover and the tern. American Rivers does not point to any evidence that indicates that the only possible way to avoid jeopardy to the plover and the tern is to implement flow changes and habitat construction. The FWS modified the RPA to prevent further degradation to the plover and tern habitat. Although American Rivers may disagree with the FWS's conclusions, the FWS has articulated a rational basis for its decision to eliminate spring and summer flow changes from the 2003 RPA.[4]

American Rivers also argues that the FWS improperly evaluated the effects on the plover and tern from the Corps' proposed operations. The Court disagrees. Although the FWS utilized a "worst-case-scenario analysis" for both the plover and the tern, the FWS also considered both the historical effects and cumulative and indirect effects of the Corps' proposed operations on the plover and tern. (FWS AR 1287; FWS AR 1540; FWS AR 1457 at 33608–30; 33634–42; 33683–85.) The baseline adopted by the FWS is proper.

b. *Sturgeon RPA*

■ The sturgeon RPA retains both flow modifications and habitat construction. The 2003 RPA proposes higher summer flows than the summer flows required in the 2000 RPA. The 2000 RPA states that "[s]ummer flows shall be decreased . . . to an interim target of 25 Kcfs by June 21, and held at 25 Kcfs until July 15 . . . on July 15, the flows shall be stair-stepped down to a flow of 21 Kcfs until August 15." (FWS AR 1237 at 29230.) The 2003 RPA proposes that for 2004, "summer habitat flow[s] [shall be] no greater than 25 Kcfs beginning no later than July 1, 2004 lasting for a minimum of 30 days at its lowest point." (FWS AR 1457 at 33760.) The 2003 RPA also allows the Corps to develop its own water flow regime, no later than March 1, 2006, but provides a default plan in the event the Corps is unsuccessful. This default plan states that: "[b]eginning on or about June 15, 2006 but no later than July 1, 2006 the Corps shall begin reducing flows to provide a minimum 30 day summer low flow release of no greater than 25 Kcfs." (*Id.* at 33762.) The Court disagrees with American Rivers' assertion that this change in summer flows is arbitrary and capricious. The 2003 Amended BiOp RPA prevents low summer flows from exceeding 25 Kcfs, and as the Corps points out, the effect at operating at 25 Kcfs instead of 21 Kcfs is minimal. Moreover, these modifications are further complemented by the implementation of other elements in the 2003 RPA.

American Rivers also argues that the 2003 RPA delays implementation of a spring rise, which was required by the 2000 RPA. The Court disagrees. The 2000

---

4. Even so, the 2003 RPA does not eliminate flow changes altogether. Although it may not specifically require the implementation of flow changes in order to preserve the plover and the tern, the RPA requires the Corps to develop a water plan that includes a spring rise and low summer flow. In the event the Corps fails to develop such a plan by March 1, 2006, a default water plan that includes both a spring rise and low summer flow must be implemented. (FWS AR 1457 at 33761–62.)

RPA permitted a spring rise only in the event that river conditions allowed such a rise. (FWS AR 1237 at 29230.) The 2003 RPA similarly permits a spring rise provided water conditions are favorable. (FWS AR 1457 at 33760–61.) In 2004, because of unfavorable water conditions, there was no spring rise. Whether a spring rise will occur in 2005 depends on the status of water conditions in 2005. The 2003 RPA does not delay spring rise, but rather requires it under favorable conditions, similar to the requirements of the 2000 RPA. Moreover, under the 2003 RPA, the Corps "shall, if hydrologic conditions are suitable, initiate an experimental spring pulse to assist and inform the process for establishing a long-term flow plan." (FWS AR 1457 at 33760–61.) Unlike the 2000 RPA, the 2003 RPA requires an annual spring rise, provided conditions are favorable. American Rivers' argument that the Corps has delayed a spring rise is without merit.

American Rivers also complains that the magnitude of the spring rise in the 2003 RPA is greatly reduced from the 2000 RPA. In the 2000 RPA, the spring rise was included to provide a spawning cue for the sturgeon, and to create and maintain sandbar habitat for the plover and the tern. Although the 2003 RPA does not require a spring rise of the same absolute magnitude as the 2000 RPA, it requires a bimodal spring rise. Water flows do not effectively construct habitat for the plover and the tern, and a bimodal spring pulse may provide greater spawning cues for the sturgeon. (FWS AR 1457 at 33761, 33765; FWS AR 1291 at 31067–72.) Any change in flood plain connectivity as a result of a lower absolute magnitude is also minimal. (Corps AR 1332 at 45605.) Although the spring rise in the 2003 RPA may differ from that in the 2000 BiOp, it is not unlawful.

American Rivers also contends that the accelerated construction of shallow water habitat is improper. Both the 2000 BiOp and the 2003 Amended BiOp recommend that the Corps develop twenty to thirty acres of shallow water habitat per mile of the Missouri River, in an effort to sustain the continued survival of the sturgeon. Although lower flows contribute to the creation of shallow water habitat, such flows do not create enough shallow water habitat to ensure the sturgeon's viability. The 2003 Amended BiOp thus included a measure that requires the Corps to artificially construct shallow water habitat in an effort to meet habitat standards. The Corps is currently operating to construct such artificial habitat, and intends to continue such operations in the future. (FWS AR 1290 at 31057.) This accelerated construction, in conjunction with other RPA elements, is an appropriate measure.

### c. *"No Jeopardy" Finding*

■ American Rivers submits that the 2003 Amended BiOp is arbitrary and capricious because it does not insure against jeopardy. American Rivers argues that it is not "reasonably certain" that (1) required flow changes will occur; (2) congressional funding will be sufficient to implement artificial habitat construction; and (3) artificial habitat construction will be effective. The FWS's no jeopardy finding need only rely on a plan that is reasonably certain to be implemented. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 254 F.Supp.2d 1196, 1213 (D.Or.2003).

American River argues that the 2003 Amended BiOp proposes flow changes that are not "reasonably certain" to occur. The 2003 Amended BiOp requires the Corps to develop, over the next two years, an appropriate flow regime that implements spring and summer flows to protect the sturgeon. In the event the Corps fails to develop this

plan, the RPA sets forth a default flow plan that implements both spring rise and lower summer flows. Because the 2003 Amended BiOp requires that such changes be implemented at the latest by March 1, 2006, the Court finds that there is a reasonable certainty that such flow changes will take effect.

American Rivers also argues that the artificial construction of sandbar habitat for the plover and the tern is an unproven mitigation measure, and thus reliance on such construction was arbitrary and capricious. The record reflects that the FWS knew, considered and evaluated both the negative and positive effects of artificial sandbar habitat construction. There is no evidence to suggest that the Corps will fail to implement the measures the FWS recommends. The Corps is further required, in addition to constructing habitat, to continuously monitor and evaluate effects on the plover and the tern, and modify operations as required. Though American Rivers disputes the ultimate success of artificial sandbar habitat creation on plover and tern populations, concerns of uncertainty are inevitable in any action an agency may take. Such concerns are insufficient to invalidate the 2003 Amended BiOp. Reasonable certainty only applies to the possibility of implementation, not to the overall success of the particular measure. The record supports that the FWS considered both the positive and negative effects of such measures, and thus rationally concluded, in conjunction with the other RPA elements, that this measure would avoid jeopardy to the species. Nothing more is required by the FWS.

American Rivers also argues that the Corps lacks appropriate funding to complete this habitat construction. By its nature, a RPA must be capable of implementation, both economically and technologically. 50 C.F.R. § 402.02. American Rivers points to no evidence to suggest

that the Corps will be economically prevented from implementing this RPA. The speculative nature of congressional appropriations is insufficient to render the RPA arbitrary and capricious.

The Court finds that the FWS's 2003 Amended BiOp and its RPA are not arbitrary and capricious. The FWS has provided a rational connection between the facts and the choice made. *Motor Vehicle*, 463 U.S. at 43, 103 S.Ct. 2856. Therefore, the 2003 Amended BiOp and its RPA do not violate Section 7 of the ESA.

d. *The Corps' Actions Result in a Take*

■ American Rivers also argues that the Corps' adoption of the 2003 RPA jeopardizes the species and results in a "take" of the species, in violation of the ESA. After consulting with the FWS, the Corps has an independent duty to insure that its actions satisfy the ESA. 16 U.S.C. § 1536(a)(2). Essentially, the Corps' decision to rely on the 2003 Amended BiOp must not be arbitrary and capricious. Because the Court finds that the 2003 Amended BiOp is valid, the Corps' reliance on the 2003 Amended BiOp is likewise valid.

Section 9 of the ESA prohibits a "take" of the endangered or threatened species. 16 U.S.C. § 1538. American Rivers argues that the 2003 Amended BiOp and RPA take the plover, tern and the sturgeon. However, the ESA permits that any taking, in compliance with the Incidental Take Statement ("ITS"), "shall not be considered to be a prohibited taking" of the species. 16 U.S.C. § 1536(o)(2). The 2003 Amended BiOp includes an ITS for the plover, tern, and sturgeon. (FWS AR 1457 at 33769–90.) The Corps has an absolute defense to a Section 9 claim so long as its operations are in accordance with the 2003 BiOp and the terms and conditions of the ITS. American Rivers fails to demonstrate

that the Corps' operations are contrary to the 2003 Amended BiOp and its ITS, and therefore there is no violation of the ESA.

## 2. *Claims by Nebraska and NPPD*

 Nebraska and NPPD ("Nebraska Parties") claim that the FWS and Corps improperly consulted under the ESA, resulting in an improper 2003 Amended BiOp and RPA. They contend that the environmental baseline used in the 2003 Amended BiOp is improper because it fails to include non-discretionary operations such as minimum flow levels. They further assert that the 2003 RPA is invalid because its proposed restoration of a natural hydrograph runs contrary to the Corps' obligations under the FCA. Because the Court concludes that the Corps does not have a non-discretionary duty to maintain minimum water flows, and that the Corps' operations are subject to the ESA, these arguments fail.

The Nebraska Parties further argue that the 2003 RPA is not economically feasible, because it improperly compromises both water supply and hydropower benefits to the Nebraska Parties. However, the requirement that a RPA be "economically and technologically feasible" only requires that the Corps have the resources and technology necessary to implement the RPA. *See Kandra v. United States,* 145 F.Supp.2d 1192, 1207 (D.Or. 2001). This argument is likewise without merit.

The Nebraska Parties also argue that the 2003 Amended BiOp and RPA are arbitrary and capricious because they are not based on the best scientific data available. The 2003 Amended BiOp proposes to restore some of the river's natural hydrograph to water flows. According to the Nebraska Parties, this proposal bears no resemblance to the river's natural hydrograph, as set forth in the U.S. Geological Survey ("USGS"). (FWS AR 915 at

14687–885.) The 2003 Amended BiOp does not strictly require the natural hydrograph contained in the USGS, but rather suggests that some "semblance" of the natural hydrograph be restored. (FWS AR 1457 at 33551.) The FWS need only recommend a RPA that prevents jeopardy, and there is no evidence that an immediate and complete restoration of pre-dam flows is the only way to prevent such jeopardy. The fact that the FWS chose not to propose a plan contained in one report is insufficient to render the FWS's decision arbitrary and capricious. The Nebraska Parties' Motions fail.

## 3. *Claims by Blaske Marine Plaintiffs and Missouri*

 Blaske Marine and MO–ARK (collectively, "Blaske Marine Plaintiffs") and Missouri submit that the Corps should operate the Missouri River as required by the 1979 Master Manual. Both Blaske Marine Plaintiffs and Missouri argue that the Corps violates the ESA because the low summer flows set out in the 2003 Amended BiOp eliminate some areas of shallow water habitat for the sturgeon in the lower Missouri River. They thus argue that this removal of habitat constitutes a "take" under the ESA. As noted above, however, because the Corps is operating the River pursuant to the 2003 Amended BiOp and the ITS, it has an absolute defense to any Section 9 claim. 16 U.S.C. § 1536(*o*). Blaske Marine Plaintiffs and Missouri argue that the ITS does not apply to the elimination of habitat on the lower Missouri River, because the ITS does not specifically reference and connect reduced spawning to reduced downstream water flows, and therefore the Corps cannot use the ITS as a defense to a claim based on this situation. The ITS anticipates a loss in spawning and nursery habitat "because of significantly reduced sediment transport and deposition." (FWS

AR 1457 at 33784.) The complete language of the ITS, however, establishes that the decrease in downstream water flow affects the transport and deposition of sediment in the lower Missouri River, thereby affecting the habitat of the sturgeon in this point of the River. *Id.* Thus, the ITS addresses the effect on the sturgeon in the lower Missouri River, and provides an absolute defense to this ESA claim.

 Even without this defense, however, there is no violation of the ESA. Blaske Marine Plaintiffs and Missouri fail to demonstrate that low summer water flows result in a "take" of the sturgeon. They argue that the low summer flows significantly modify or degrade the habitat, which actually kills or injures the sturgeon. *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 697, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). Though the parties concede that lower flows decrease shallow water habitat in this particular area of the river, Blaske Marine Plaintiffs and Missouri fail to set forth any evidence that this habitat modification actually causes any injury to the sturgeon. Blaske Marine Plaintiffs and Missouri fail to acknowledge that the FWS considered this argument in the 2003 Amended BiOp, and concluded that although lower summer flows may result in a reduction of shallow water habitat in the lower Missouri River, there is no evidence that such action will actually kill or injure the sturgeon. (FWS AR 1457 at 33784.) Blaske Marine Plaintiffs and Missouri fail to consider the effects on the sturgeon of increasing water flows on other areas of the river. Moreover, the slight reduction in habitat in the lower river does not negate the fact that the 2003 Amended BiOp results in an overall net gain in the amount of shallow water habitat on the Missouri River. In fact, lower flows in the 2003 RPA reduce habitat in the lower Missouri River by approximately 200 acres com-

pared to the 1979 Master Manual RPA, while the overall increase of shallow water habitat on the entire Missouri River under the 2003 RPA compared to the 1979 Master Manual RPA is approximately 1,189 acres. (FWS AR 1291 at 31077, 31079.) Absent some evidence that injury will result to the sturgeon, Blaske Marine Plaintiffs and Missouri's Motions on this point are denied.

Similar to the argument advanced by the Nebraska Parties, Missouri also argues that the 2003 Amended BiOp and RPA are invalid because the FWS and the Corps improperly consulted under the ESA. Missouri also submits that the RPA is invalid because it requires the Corps to violate the FCA by not maintaining minimum flows. As the Court has previously indicated, the FCA does not impose a non-discretionary duty to maintain minimum navigation flows, so these arguments fail.

Missouri further claims that the mandatory language in the 2003 RPA is an attempt by the FWS to supercede the Corps' authority and to "govern the way that the Corps manages the River system." The Court is unpersuaded by this argument. Missouri fails to cite to any legal authority that indicates that the existence of mandatory language in a RPA invalidates it as a matter of law. Moreover, absent any evidence that either the FWS intends to bind the Corps to its RPA or that the Corps considers itself bound by the FWS's RPA, this argument fails.

### 4. *Conclusion*

The Court finds that the 2003 Amended BiOp and RPA are not arbitrary and capricious and thus are in accord with the ESA. Likewise, the 2004 Master Manual, 2004 AOP, and ROD do not violate the ESA.

## C. National Environmental Policy Act Claims

NEPA requires that federal agencies prepare an Environmental Impact Statement ("EIS") for every "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); see 42 U.S.C. §§ 4321–4370f. An EIS must examine: (1) the environmental impacts of the proposed action; (2) the adverse environmental effects of the action that cannot be avoided; (3) alternatives to the proposed action; (4) the relationship between local, short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitment of resources that would be involved. 42 U.S.C. § 4332(2)(C). Once the EIS is completed, the agency must prepare a ROD. The Court reviews under NEPA "to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97–98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). NEPA ensures that the Corps' actions are procedurally valid.

The Corps originally considered the impacts of seven alternatives submitted by different parties. (Final EIS at 4–3 to 4–11; 5–1 to 5–168.) Then, the Corps conducted a detailed analysis of five different alternatives to the 1979 Master Manual: (1) the Modified Conservation Plan ("MCP"), which includes increased drought conservation measures, unbalanced storage among the three upper and largest lakes in the Mainstem Reservoir System, and a Fort Peck spring rise approximately every third year; (2) GP1528,[5] which includes a 15 Kcfs spring rise release from mid-May to mid-June followed by a minimum service flat release of 28 Kcfs that ends on September 1; (3) GP2021, which has a 20 Kcfs spring rise followed by a 25 Kcfs release to mid-July when the release drops to a low of 21 Kcfs until mid-August, when it returns to 25 Kcfs until September 1; (4) GP1521, which has a 15 Kcfs spring rise release from mid-May to mid-June followed by a release of 21 Kcfs; and (5) GP2028, which has a 20 Kcfs spring rise followed by a 28 Kcfs release to mid-May to mid-June followed by a release of 28 Kcfs. (Final EIS at 6–3.) Out of these five alternatives, the Corps eventually identified a Preferred Alternative ("PA") that included "more stringent drought conservation measures, a more defined methodology for unbalancing the upper three lakes, higher non-navigation season flows, and a planned re-evaluation in 3 years." (*Id.* at 8–1.) The 2004 Master Manual and 2004 AOP thus evolve from this PA.

### 1. Missouri

Missouri argues that Federal Defendants violated NEPA because the adoption of "adaptive management" process is improper, and the economic analysis used by the Corps in choosing the PA is flawed and misleading. Missouri fails to demonstrate that the Federal Defendants' decisions were arbitrary and capricious.

The Final EIS and the 2004 Master Manual describe the "adaptive management" process. Adaptive management is an approach to natural resources management, in which policy choices are made incrementally. As each choice is made, data on the effects of these choices are collected and analyzed in order to assess whether to retain, reverse, or otherwise alter the policy choice. Missouri maintains

5. "GP" means "Gavins Point" and the two numbers that follow correspond to the spring release and summer release, respectively.

that this adaptive management approach violates NEPA because it permits the Corps to circumvent the NEPA process when policy choices are modified. Missouri takes issue with the potential flow changes that the Corps may undertake in the future. Missouri fails to point to any evidence that indicates that the Corps intends to avoid its NEPA obligations by implementing this adaptive management approach. To the contrary, the Corps acknowledges that in the event a major policy change results, the Corps will be required to comply with NEPA. (Final EIS at D1–69; Corps AR 1970 at 3.) Absent evidence that the adaptive management process actually results in the Corps' evasion of NEPA obligations, the Court declines to declare this approach invalid.

Missouri also argues that the Final EIS is flawed because it incorrectly calculated the value of benefits to navigation and downstream water supply resulting from the adoption of the RPA. Missouri essentially contends that it is impossible for any increased economic benefit to result to navigation and downstream water supply as a result of lower downstream water flows. Missouri disagrees with the Corps' conclusions, but fails to demonstrate why the Corps' analysis is arbitrary and capricious. The Corps comparatively evaluated the economic effects of the PA to the 1979 Master Manual on a variety of different river interests, including navigation and water supply. (*See* Final EIS 8–10 to 8–49.) The Final EIS was based on the previous draft EIS and its comments, as well as other economic studies. Missouri may disagree with the Corps' conclusions and its rationale, but that is insufficient to argue that the Corps failed to take a "hard look" at the economic impact of its decision. *Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115, 1128 (8th Cir.1999) The Corps articulates a rational basis for its conclusions. Missouri's disagreement with the Corps' conclusions is insufficient to render the Final EIS arbitrary and capricious.

### 2. *Blaske Marine and MO–ARK*

The 2004 AOP requires that the Corps restrict summer flows from Gavins Point to 25 Kcfs for a period of 30 days beginning July 1, 2004. If the Corps develops 1200 acres of shallow water habitat by July 1,[6] the Corps may engage in another consultation with the FWS to determine how much higher it can adjust summer flows.[7] Blaske Marine and MO–ARK (collectively, "Blaske Marine Plaintiffs") assert that the Corps must prepare a supplemental EIS discussing the impacts of operating under such conditions.[8] Blaske Marine Plaintiffs also argue that the default water flow plan set for March 2006 contained in the 2003 RPA requires a supplemental EIS.

The 2003 Amended BiOp proposes a flow of 25 Kcfs for 30 days beginning July 1, 2004. The 2004 AOP implements this alternative. The Final EIS issued on March 5, 2004, evaluated the effects of

---

**6.** Federal Defendants represented to the Court at oral argument on May 21, 2004, that the Corps fully intended to successfully complete this habitat construction by July 1, and that the current status of the construction was on track for such completion. On June 14, 2004, Federal Defendants informed the Court that construction was complete and that consultation between the FWS and Corps had begun. The FWS anticipates that it will issue an opinion relating to 2004 summer flows on June 22, 2004.

**7.** Any claims relating to the outcome of this consultation between the FWS and Corps are not ripe for review.

**8.** Blaske Marine Plaintiffs failed to include this claim in their Complaint. Consistent with the Court's oral ruling on May 21, 2004, the Court permits Blaske Marine Plaintiffs to amend their Complaint to include this claim.

summer flows at 21 Kcfs and at 28.5 Kcfs. (Final EIS Table 7–1.) The Final EIS does not specifically evaluate the effects of flows at 25 Kcfs. However, flows at 25 Kcfs are within the range of alternatives evaluated by the Corps. The purpose of the Final EIS is to ensure that the Corps takes a "hard look" at the environmental consequences of a project before taking a major action. *Friends of the Boundary Waters Wilderness,* 164 F.3d at 1128. An EIS must discuss alternatives to the proposed action, and the sufficiency of the range of alternatives evaluated is subject to the "rule of reason." *Id.* The "rule of reason" requires the Court to determine whether the Corps has complied with the Final EIS in good faith, and whether the Final EIS "sets forth sufficient information to allow the decision-maker to consider alternatives and make a reasoned decision after balancing the risks of harm to the environment against the benefits of the proposed action." *Id.* The Final EIS need not be exhaustive. *Id.* The Court finds that although the Final EIS did not specifically evaluate summer flows at 25 Kcfs, the range of alternatives discussed in the Final EIS encompassed such flows. Thus, the Final EIS sufficiently examined summer flows at 25 Kcfs.

In conjunction with these flow levels, the Corps anticipates that it will complete construction of 1200 acres of shallow water habitat by July 1, 2004. Blaske Marine Plaintiffs contend that construction of this habitat requires a supplemental EIS. In both the 2000 BiOp and the 2003 Amended BiOp, the FWS set a goal to develop twenty to thirty acres of shallow water habitat per mile of the Missouri River. From years 2000 to 2020, 20,000 acres of shallow water habitat must be developed. Low summer flows help to develop shallow water habitat, but not at the level required to protect the sturgeon. The FWS concluded that a multi-faceted approach was necessary to achieve its goals: reservoir operational changes, structural modifications, and non-structural modifications. The FWS determined that 4900 acres of shallow water habitat results from flows at 21 Kcfs for a period from mid-July to mid-August, while 3,717 acres of shallow water habitat results from full navigation flows of 34.5 Kcfs from mid-July to mid-August. The difference between shallow water habitat construction at low flows and at full navigation flows is thus 1200 acres. If the Corps artificially constructs 1200 acres of shallow water habitat by July 1, depending on its consultations with the FWS, it may operate at possibly full navigation flows because the 1200 acres of artificial habitat construction will compensate for the smaller levels of shallow water habitat construction at full navigation flows. Both the 2000 BiOp and the 2003 Amended BiOp contemplate that artificial habitat construction is necessary to maintain sufficient shallow water habitat. The Final EIS also acknowledges that artificial shallow habitat construction is needed to provide enough shallow water habitat. (Final EIS 7–71.) Moreover, Blaske Marine Plaintiffs fail to demonstrate that this shallow water habitat construction is a "major Federal action[ ] significantly affecting the quality of the human environment," or that a categorical exclusion does not apply. 42 U.S.C. § 4332; 62 Fed.Reg. 2375, 2381 (Jan. 16, 1997).[9] This failure is fatal to the

---

**9.** The Court further notes, based on representations by the Federal Defendants that 1200 acres have been created, that Blaske Marine Plaintiffs' claim on this point is likely moot. *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (supplemental EIS not required if "major" federal action already completed); *Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (9th Cir.1988) (dismissing plaintiffs' NEPA claim because ordering compliance with NEPA would have no effect on the already-completed agency action).

claim that the FWS must issue a supplemental EIS.

Blaske Marine Plaintiffs also argue that the proposed default water plan that may potentially take effect in March 2006, requires a supplemental EIS. The proposed default water plan was not evaluated nor considered under the Final EIS. This default plan takes effect in 2006 only if the Corps fails to develop "a flow management plan ... [that] provide[s] a spring rise and summer flow which will provide for the life history needs of the pallid sturgeon." (FWS AR 1457 at 33761.) Because neither the default plan nor any future plan were evaluated under any of the alternatives contained in the Final EIS, further NEPA analysis may be required.[10] 40 C.F.R. § 1502.9(c)(1) (supplemental EIS required when the "agency makes substantial changes in the proposed action that are relevant to environmental concerns," or when there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts"). However, this issue is not yet ripe for the Court's review.

### 3. *South Dakota*

 South Dakota argues that the Corps violated NEPA because it failed to consider the modified "Governors' Summit Proposal" (a.k.a. "Nebraska Proposal") in its analysis of drought conservation measures. South Dakota also contends that the Corps improperly considered the interests of the Mississippi River stakeholders in determining the preferred alternative for drought conservation. Finally, South Dakota contends that the Corps failed to consider shortening the navigation season in the spring rather than in the fall.

The Governors within the Missouri River basin held a summit meeting in September 2003 to discuss the conflict over river operations. A summit plan was created by those in attendance. Although this report was not specifically included in the Final EIS, the range of proposals considered by the Corps in the Final EIS encompassed the proposals in the Governor's Summit Proposal. For example, the Governor's Summit Proposal envisioned that operations would include low summer flows at 25 Kcfs. As previously discussed, the Final EIS contained an analysis of low summer flows of 21 Kcfs to 28 Kcfs, thus encompassing flows proposed in the Governor's Summit Proposal. The Corps is under no obligation to consider each and every alternative, but rather it must evaluate a considerable range of alternatives to allow it to "make a reasoned decision." *Friends of Boundary Waters Wilderness*, 164 F.3d at 1128. South Dakota fails to demonstrate that the Corps' alleged failure to specifically consider this report was arbitrary and capricious.

The Corps' consideration of the impact of the PA on the Mississippi River was not arbitrary or capricious. NEPA requires that the agency evaluate all foreseeable impacts of a major federal action. The operation of the Missouri River impacts the operation of the Mississippi River. Moreover, South Dakota submits no legal authority to support its claim that the Corps evaluated too many considerations.

Finally, South Dakota submits that the Corps acted arbitrarily and capriciously because it failed to adopt an alternative that shortened the navigation season in the spring, rather than in the fall. According to South Dakota, shortening the navigation period in the spring preserves more water

---

**10.** The Court does not intend to make any finding regarding the Corps' obligations un-

der NEPA for this potential future action.

in the upstream reservoirs during the essential fish spawning period. However, the Corps points out that the greatest infusion of water occurs in the spring. If the Corps shortened the water season in the spring, it would do so without considering the water infusions from winter precipitation and spring flows. Failure to consider the spring infusion of water flow may result in an unnecessary shortening of the navigation season. The decision to shorten the fall navigation season is made by July 1 of each navigation year, which allows affected parties to adjust their operations and interests accordingly. If the Corps shortens the spring navigation season in March, the decision to shorten the spring season would have to be made in December, when it is impossible to judge future water conditions. South Dakota fails to establish that the Corps' alleged failure to consider this alternative is arbitrary or capricious. South Dakota's claims fail.

### 4. *American Rivers*

American Rivers asserts that the Corps violated NEPA because it selected a PA without "adequate explanation." (Am. Rivers Mem. in Opp'n to FCA/NEPA claims at 4.) American Rivers contends that the Corps failed to explain why the PA it selected was superior to the other evaluated alternatives, in particular

GP2021, and thus that the Corps' decision is arbitrary and capricious.

NEPA only requires that the Final EIS demonstrate that the agency in good faith objectively has taken a "hard look" at the environmental consequences of a proposed action and alternatives. *Friends of the Boundary Waters Wilderness*, 164 F.3d at 1128. The Final EIS must provide sufficient detail to permit those who did not participate in its preparation to understand and consider the relevant environmental influences involved. Finally, an agency's consideration of alternatives need only be reasonable. *Id.*[11]

The Corps evaluated the five alternatives under four objectives, to select the PA that:

(1) serve[d] the contemporary needs of the Missouri River Basin and the Nation; (2) complie[d] with environmental laws, including the [ESA]; (3) serve[d] Congressionally authorized project purposes; and (4) fulfill[ed] the Corps' responsibilities to Federally recognized Tribes.

(Final EIS at 8–1.) The Corps ultimately selected a PA that best met these objectives:

The rationale for selecting the PA is a composite of analyses, information briefings, technical expertise, and comments concerning the resources evaluated as

---

11. Under NEPA, the agency:
should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public.... [A]gencies shall: (a) rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated; (b) devote substantial treatment to each alternative considered in detail including the proposed action so that

reviewers may evaluate their comparative merits; (c) include reasonable alternatives not within the jurisdiction of the lead agency; (d) include the alternative of no action; (e) identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference; and (f) include appropriate mitigation measures not already included in the proposed action or alternatives.
40 C.F.R. § 1502.14.

part of the Study. The Corps believes that the PA, when combined with other measures ... conserves more water in the upper three lakes during extended droughts, meets the needs of ESA-listed fish and wildlife species, is consistent with the Corps' responsibilities under environmental laws and Tribal trust responsibilities, and provides for the Congressionally authorized uses of the system.

(*Id.* at 8–4.) In selecting this PA, the Corps conducted a detailed analysis of all five alternatives and the 1979 Master Manual, in the areas of (1) hydrology; (2) water quality; (3) sedimentation, erosion and ice processes; (4) economic effects; and (5) environmental effects. (*Id.* at 7–1 to 7–256.) The Final EIS presents an analysis pertaining to each criteria in comparative form. (*Id.*) The Final EIS then describes the PA, the effects of the PA, and directly compares the PA to the MCP alternative and the 1979 Master Manual. Although the PA is not directly compared to GP2021, American Rivers fails to cite any legal authority to support the assertion that such a comparison is required. Moreover, American Rivers fails to demonstrate why the detailed analyses and comparisons included in Chapter Seven of the Final EIS are insufficient under NEPA. The Court thus finds that the Corps' decision to implement the PA was made in good faith after proper consideration of the alternatives, and is therefore reasonable and complies with NEPA.

### 5. *Conclusion*

Federal Defendants' Motion for Summary Judgment on NEPA claims is granted. The Motions by Missouri, Blaske Marine Plaintiffs, South Dakota, and American Rivers are denied.

### D. Collateral Claims

#### 1. *Mandan, Hidasta, and Arikara Nation*

The Nation claims that Federal Defendants must operate the River in a manner that: (1) best protects Tribal trust assets and advances economic self sufficiency of the Nation and its members; (2) avoids adverse impacts to federally protected cultural resources and burial sites; and (3) assures the low-income residents of the Fort Berthold Indian Reservation that their recreation and fishing economies will not disproportionally suffer. The Nation also requests that the Court direct Federal Defendants to identify and transfer excess project lands at Lake Sakakawea to the Nation and neighboring entities.[12] Federal Defendants claim that the Nation lacks Article III standing.

The jurisdiction of the federal courts is limited to cases or controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Among other constitutional minimums, a "case or controversy" requires the plaintiff to have standing to litigate the action. Standing burdens the plaintiff to demonstrate: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) that a favorable court decision can redress the injury. *Id.*

 The Nation seeks an order directing the Corps to consider certain tribal interests and to operate the River in a particular way. However, the Nation fails to articulate any injury in fact. The Nation has failed to establish either a concrete and particularized injury, or actual or imminent injury. *See id.* Although the

---

**12.** The Nation originally pursued a claim under North Dakota's Clean Water Act. As a result of this Court's order in *North Dakota v. U.S. Army Corps of Eng'rs*, Civil File No. 03– 4288, 03–MD–1555 (Apr. 12, 2004) (PAM), the Nation and the Corps stipulated to dismissal of Count III of the Nation's Complaint.

Nation clearly identifies its concerns and its particular interest in River operations, it fails to indicate how the 2004 Master Manual and 2004 AOP or any other action of the Federal Defendants have resulted or will result in injury. "[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Because the Nation has failed to articulate any injury in fact, the Nation lacks standing and its Amended Complaint must be dismissed.

### 2. *Blaske Marine Plaintiffs*

Blaske Marine Plaintiffs have asserted collateral claims that challenge: (1) the stocking of non-native and native fish in the Missouri River; (2) the final rule published by the FWS designating a critical habitat for the piping plover; and (3) Federal Defendants' compliance with the Information Quality Act ("IQA").

### a. Fish Stocking Claims

Blaske Marine Plaintiffs assert that the stocking of fish by Montana, North Dako-

ta, South Dakota ("the States") and the FWS, "may or will have" adverse effects on the pallid sturgeon and the environment, in violation of the ESA. (Blaske Marine Pls.' Mem. in Supp. of Mot. on Eighth Claim for Relief at 2.) Blaske Marine Plaintiffs contend that the States and the FWS violated NEPA by failing to prepare an EIS on the fish stocking program because of these possible effects.[13]

The States have programs that stock fish in the Missouri River and its mainstem reservoirs. The States receive federal funding for these programs. (FWS Fish Stocking ("FS") AR 38 at 936.) The FWS also provides stocking fish from its own hatcheries to the States. Fish stocked include native and non-native species. The non-native species include chinook salmon, rainbow trout, rainbow smelt and walleye. (FWS FS AR 102.) Blaske Marine Plaintiffs contend that the FWS failed to comply with NEPA because it did not prepare an EIS on fish stocking. FWS argues that an EIS was unnecessary, because a categorical exclusion applied.[14]

 Under NEPA, an EIS is not necessary when the action in question falls

---

**13.** Blaske Marine Plaintiffs also allege that the States and the FWS's fish stocking violates Section 9 of the ESA, because it "takes" the sturgeon. Both FWS and the States have filed substantive Motions against Blaske Marine Plaintiffs on this issue, to which Blaske Marine Plaintiffs failed to respond. Because Blaske Marine Plaintiffs fail to demonstrate that the stocking of fish in mainstem reservoirs constitutes a "take" of the sturgeon, both FWS's and the States' Motions must be granted on this point.

**14.** Although the Court concludes that the FWS was not legally required to prepare an EIS with respect to fish stocking, the Court notes that Blaske Marine Plaintiffs' standing to raise this claim is questionable. NEPA challenges under the APA require Blaske Marine Plaintiffs to demonstrate that their alleged injuries fall within the zone of interests that NEPA is designed to protect. NEPA's broad purpose is to "promote efforts which will prevent or eliminate damage to the envi-

ronment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. Blaske Marine Plaintiffs are downstream interests with concerns focused on the level of downstream water flows. Most, if not all, of the organizations represented by Blaske Marine Plaintiffs, allege economic injury from lower downstream flows. Federal Defendants and the States present a persuasive argument that Blaske Marine Plaintiffs' injury from fish stocking activities is solely economic in nature, and therefore not protected by NEPA. However, Blaske Marine Plaintiffs do allege that maintaining higher water levels in upstream reservoirs to support fish stocking activities causes harm to the environment by reducing habitat for the plover and the tern. Blaske Marine Plaintiffs thus assert that their interests are not purely economic. Parties motivated in part by the protection of their own economic interests may challenge agency action so long as their environmental interests are not so insignificant that they should be disregarded altogether. *Rosebud Sioux Tribe*

within a categorical exclusion established through the agency's own NEPA implementation procedures. 40 C.F.R. § 1501.4(a)(2). A categorical exclusion does not "individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." 40 C.F.R. § 1508.4. Under its NEPA implementation procedures, the FWS concluded that a categorical exclusion applied, rendering an EIS relating to fish stocking unnecessary. *See* 62 Fed. Reg. 2375, 2381 (Jan. 16, 1997) (defining categorical exclusions). The Court reviews an agency determination that an action falls within a categorical exclusion under the arbitrary and capricious standard. *Friends of Richards–Gebaur Airport v. F.A.A.*, 251 F.3d 1178, 1187 (8th Cir.2000). Blaske Marine Plaintiffs contend that the FWS's determination that a categorical exclusion applied was arbitrary and capricious because of the past and potential harm such stocking has on the pallid sturgeon and the environment.

Blaske Marine Plaintiffs rely heavily on a report prepared by Dr. Harold Tyus.[15] *(See* FWS FS AR 92.) In that report, Dr. Tyus comments on the possibility that non-native fish adversely affect the sturgeon. This report is broad and generalized, fails to indicate which non-native fish adversely affect the sturgeon, and does not connect the fish stocking activities of the States or the FWS to the alleged harm. Blaske Marine Plaintiffs' reliance on Dr. Tyus's report is unpersuasive.

■ The record establishes that the FWS's decision to apply a categorical exclusion is not arbitrary nor capricious. The sturgeon was originally listed as threatened because of "habitat modification, apparent lack of natural reproduction, commercial harvest, and hybridization in part of its range," not for reasons related to fish stocking. (FWS FS AR 5.) Moreover, the record supports that the FWS considered many possible effects of fish stocking on the sturgeon, including predation and competition, and concluded that fish stocking activities would not adversely affect the sturgeon. (FWS FS AR 19 at 410–412; *id.* 38 at 936–937; *id.* 62 at 1833–1834.) The record simply does not support Blaske Marine Plaintiffs' assertion that a "significant" effect will result either on the environment or the pallid sturgeon as a result of fish stocking activities. The FWS's application of a categorical exclusion is therefore not arbitrary and capricious. Blaske Marine's Motion for Summary Judgment thus fails.[16]

---

*v. McDivitt,* 286 F.3d 1031, 1038 (8th Cir. 2002). Though the Court finds Blaske Marine Plaintiffs' connection to environmental injury attenuated at best, the Court will presume that Blaske Marine Plaintiffs have standing and will consider the merits of this claim.

15. The States have filed a *Daubert* Motion to exclude this extra-record submission, as well as the other exhibits accompanying Blaske Marine Plaintiffs' Motion. The Federal Defendants have also filed a Motion to Strike this evidence, to the extent that it is not part of the administrative record. Blaske Marine Plaintiffs submit that because the relief they seek is prospective in nature, the Court is entitled to look at extra-record evidence. The

Court finds that argument unpersuasive. Even so, the Court declines to address the Motion to Strike or the *Daubert* Motion, as Dr. Tyus's report is properly part of the administrative record.

16. Because this claim against the FWS fails, it likewise fails against Montana, North Dakota and South Dakota. Even so, the States are not proper parties for this NEPA claim. Blaske Marine Plaintiffs argue that NEPA was violated because an EIS was not issued on fish stocking. However, the FWS, not the States, is responsible for EIS determinations, and therefore Montana, North Dakota and South Dakota are inappropriate defendants for this claim.

### b. *Critical Habitat Claims*

In 2002, the FWS designated the critical habitat for the piping plover. Blaske Marine Plaintiffs contend that this critical habitat designation violates the ESA, NEPA, the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), and the notice and comment procedures of the APA.

The ESA directs the Secretary of the Interior to list a particular species as endangered or threatened. It also directs the Secretary to designate critical habitat "to the maximum extent prudent and determinable" at the time of the species listing. 16 U.S.C. § 1533(a)(3)(A). A critical habitat is the geographical area that the species occupies. The physical or biological features of the critical habitat are essential to the species' conservation and require special management or protection. *Id.* § 1532(5)(A)(i). The critical habitat designation must be made by relying on the best scientific data available, taking into consideration the economic impact and any other relevant impact of specifying an area a critical habitat. *Id.* § 1533(b)(2).

### i. *ESA Claims*

Blaske Marine Plaintiffs argue that the FWS violated the ESA because it failed to properly consider the economic and other impacts resulting from the designation of the plover's critical habitat, and then failed to properly balance these impacts against the benefits of the habitat designation. Blaske Marine Plaintiffs specifically contend that the FWS should have excluded a small area in its habitat designation below Fort Randall and Gavins Point.

██ Blaske Marine Plaintiffs do not have standing to raise this claim. Blaske Marine Plaintiffs allege that their economic interests, such as power production and regional transportation, suffer because of the lack of downstream water flow. Blaske Marine Plaintiffs submit that the FWS failed to consider these economic factors and impacts in the plover's critical habitat designation, and thus failed to exclude the area below Fort Randall and Gavins Point from the plover's critical habitat. However, Blaske Marine Plaintiffs fail to indicate how excluding this area from critical habitat redresses their alleged injuries resulting from decreased downstream water flows. Even if this area were excluded from critical habitat, Blaske Marine Plaintiffs provide no evidence that this exclusion would increase downstream water flows or somehow redress their alleged injuries. Irrespective of critical habitat designation, the Corps is still required to maintain water flows to comply with its other legal obligations. Blaske Marine Plaintiffs fail to establish that impairment of their interests are actually attributable to the critical habitat designation. Thus, Blaske Marine Plaintiffs lack standing to challenge the critical habitat designation of the plover under the ESA.

██ Even if Blaske Marine Plaintiffs had standing, however, the Court finds that the FWS sufficiently considered all economic factors and impacts, and properly balanced these impacts in its designation. In *New Mexico Cattle Growers Assoc. v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277 (10th Cir.2001), the Court required that the FWS examine all economic impacts of the critical habitat designation, irrespective of whether such impacts were co-extensive with other causes. *Id.* at 1283. In this case, in its economic analysis, the FWS expressly acknowledged its duties under *New Mexico Cattle Growers.* (FWS Critical Habitat ("CH") AR 5–2584 at 13368, 13397.) The analysis considered and evaluated both impacts associated with listing the plover under the ESA and impacts related to the designation of the critical habitat, as well as impacts attribut-

able to other causes. (FWS CH AR 5–2584.) The FWS ultimately concluded that the benefits of excluding the area below Fort Randall and Gavins Point did not outweigh the benefits of designating such an area as critical habitat. (FWS CH AR 5–2584.) The Court finds that the FWS did not act arbitrarily or capriciously in designating critical habitat for the plover.[17]

### ii. NEPA Claims

Blaske Marine Plaintiffs submit that the critical habitat designation is flawed because the FWS failed to follow NEPA procedures in the designation.[18] Under NEPA and its corresponding regulations, an agency may prepare an Environmental Assessment ("EA") in lieu of an EIS, as long as the agency's proposed action does not clearly require an EIS. 40 C.F.R. § 1501.4(a)-(b); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 124 S.Ct. 2204, 2208, 159 L.Ed.2d 60 (2004). If the agency concludes that an EIS is not required, then it must issue a "finding of no significant impact" ("FONSI") that describes why the proposed action will not significantly impact the human environment. 40 C.F.R. §§ 1501.4(e), 1508.13. In this case, the FWS conducted an Environmental Assessment ("EA") that evaluated four different alternatives, published the EA for public review and comment, and thereafter issued a FONSI for the plover's critical habitat designation.

■ An agency's decision not to prepare an EIS will be set aside only if its decision is arbitrary and capricious. 5 U.S.C. § 706(2)(A); *Sierra Club v. U.S. Forest Serv.*, 46 F.3d 835, 838 (8th Cir. 1995). The Court considers four factors to determine whether the FWS's decision not to prepare an EIS is arbitrary and capricious: (1) whether the FWS took a "hard look" at the problem; (2) whether the FWS identified the relevant areas of environmental concern; (3) whether the FWS made a convincing case that the impact was insignificant; (4) if there was impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum. *Earth Protector, Inc. v. Jacobs*, 993 F.Supp. 701, 706 (D.Minn.1998) (Tunheim, J.) (citing *Audubon Soc'y of Cent. Ark. v. Dailey*, 977 F.2d 428, 434 (8th Cir.1992)). The Court must determine if the FWS made a clear error in judgment. *Id.*

■ Blaske Marine Plaintiffs submit that the FWS should have prepared an EIS. because the impacts on the human environment are "significant." The FWS is required to evaluate both the context and intensity to determine whether the critical habitat designation will have significant impacts. 40 C.F.R. § 1508.27. "Intensity" refers to the severity of the impact, which can be evaluated by considering ten different factors. *Id.* Blaske Marine Plaintiffs contend that the mere

---

**17.** Blaske Marine Plaintiffs alternatively submit that the FWS designated critical habitat although it had insufficient information to make such a determination. However, the FWS points out that the designation in this instance was pursuant to Court order, and that it was based on the best scientific information available at that time. *See* 67 Fed. Reg. 57638, 57642.

**18.** Whether NEPA procedures must be followed for the designation of critical habitat is

an issue of first impression in the Eighth Circuit. In *Douglas County v. Babbitt*, 48 F.3d 1495 (9th Cir.1995), the Ninth Circuit determined that a NEPA analysis is not required, while in *Catron County Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429 (10th Cir.1996), the Tenth Circuit held otherwise. Because the Court finds that the FWS complied with NEPA, it declines to evaluate whether the FWS is required to comply with NEPA in a critical habitat designation.

existence of any of these factors is sufficient to render the impact "significant." The Court disagrees. As required by the regulations, the EA considered all ten factors, and concluded that any impact would be minimal. (FWS CH AR 1–111 at 1817–18.) Blaske Marine Plaintiffs fail to demonstrate how any of the alleged "plethora" of impacts are significant under NEPA. Blaske Marine Plaintiffs' argument on this point fails.

Blaske Marine Plaintiffs further argue that the FWS failed to consider any effects the critical habitat designation had on the human environment. The Court disagrees. The EA addressed impacts on fish and wildlife, recreation, agriculture (including farming and grazing), water management, and socioeconomics such as property values. (FWS CH AR 1–111 at 1805–16.) The EA also evaluated each of the ten intensity factors, and concluded that those impacts, including any on the human environment, would be minimal. Blaske Marine fails to demonstrate that the FWS's decision to issue an EA and FONSI instead of an EIS was an "error in judgment."

iii. *Regulatory Flexibility Act and Small Business Regulatory Enforcement Fairness Act Claims*

██ Blaske Marine Plaintiffs argue that the FWS's critical habitat designation violated the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601–12, and the Small Business Regulatory Enforcement Flexibility Act ("SBREFA"), 5 U.S.C. §§ 801–08. Generally, under RFA, a regulatory flexibility analysis must be prepared and made available for public comment on the impacts of the proposed rule. 5 U.S.C. §§ 603, 604. If the agency certifies that the rule will not have a significant impact on a substantial number of small entities, this analysis is not required. *Id.* § 605(b). In this case, the FWS certified that the critical habitat designation would not have a significant impact on a substantial number of small entities. 67 Fed.Reg. 57638, 57676 (Sept. 11, 2002). This certification also set forth the rationale for its conclusion. *Id.* Blaske Marine Plaintiffs submit that this finding is arbitrary and capricious because it relies on the FWS's erroneous economic analysis. Because the Court concluded that the baseline in the economic analysis was not flawed, Blaske Marine Plaintiffs' argument on this point fails. (*See supra* Section D(2)(b)(iii).)

██ Under SBREFA, before a rule can take effect, the FWS is required to submit to Congress a report containing a copy of the rule, a general statement relating to the rule, including whether it is a major rule, and the proposed effective date of the rule. 5 U.S.C. § 801(a)(1)(A). A "major rule" is one that will likely result in (1) an annual effect on the economy of $100 million or more; (2) a major increase in costs or prices for consumers, individual industries, federal state, or local government agencies, or geographic regions; or (3) any significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of the domestic enterprises to compete with foreign enterprises in domestic and export markets. 5 U.S.C. § 804(2). The FWS determined that the designation of the plover's critical habitat was not a major rule under § 804(2). 67 Fed.Reg. 57638, 57677 (Sept. 11, 2002). Under SBREFA, this determination is not subject to judicial review. 5 U.S.C. § 805. Even so, there is no evidence that the FWS's decision was arbitrary and capricious. Blaske Marine Plaintiffs' claims under RFA and SBREFA fail.

iv. *APA Claims*

Blaske Marine Plaintiffs also assert that the final rule issued by the FWS for the critical habitat designation deviated so

much from the proposed rule that it violated 5 U.S.C. § 553 by failing to provide for additional public review and comment. The FWS submits that the final rule was a "logical outgrowth" of the proposed rule and therefore, an insufficient deviation to warrant additional review and comment.

The APA requires that an agency allow for public comment and review in its rule making procedures. 5 U.S.C. § 553. A final rule which contains changes from the proposed rule need not always go through a second notice and comment period. An agency can make even substantial changes from the proposed version, as long as the final changes are in character with the original scheme and a logical outgrowth of the notice and comment. The essential inquiry is whether the commenters have had a fair opportunity to present their views on the contents of the final plan. [The Court] must be satisfied, in other words, that given a new opportunity to comment, commenters would not have their first occasion to offer new and different criticisms which the Agency might find convincing. Thus, where the final rules are a result of a complex mix of controversial and uncommented upon data and calculations, remand may be in order. *Natural Res. Def. Council, Inc. v. E.P.A.*, 824 F.2d 1258, 1283 (1st Cir.1987) (citations and quotation omitted). Blaske Marine Plaintiffs contend that the final rule acknowledges economic impacts that the proposed rule did not address, and that the final rule is so significant a deviation that it warrants an additional comment and review period. The Court finds Blaske Marine Plaintiffs' argument unpersuasive and unsupported by the record. As the FWS points out, the proposed rule recognized that the critical habitat designation would result in minimal economic impacts. (FWS CH AR 5–2584.) Although the final rule further detailed these economic impacts, the Court does not find that these extensions are not in "character" with the proposed rule. Blaske Marine Plaintiffs further fail to indicate that any of their potential comments would have offered new or different criticisms that the FWS might have found convincing. Thus, the Court finds that the FWS did not violate the APA by failing to provide an additional comment period for the critical habitat designation.

### c. *Information Quality Act Claims*

Blaske Marine Plaintiffs also claim that Federal Defendants have violated the Information Quality Act ("IQA"), 44 U.S.C. § 3516. Specifically, they argue that Federal Defendants failed to comply with their request for "information and science" regarding the augmented spring pulse and proposed default flow plan scheduled for March 2006. However, the language of the IQA indicates that the Court may not review an agency's decision to deny a party's information quality complaint.

The IQA does not provide for a private cause of action, and Blaske Marine Plaintiffs seek judicial review under the APA. Federal Defendants dispute that the APA can be invoked, claiming that there is no law for the Court to apply. Generally, the APA permits the Court to review an agency action. 5 U.S.C. § 702. However, if an agency action is committed to agency discretion by law, the Court is not entitled to conduct any review. 5 U.S.C. § 701(a)(2). If a statute is "drawn in such broad terms" that "there is no law to apply," then the agency action is committed to agency discretion. *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). Although the IQA directs the Office of Management and Budget ("OMB") to issue guidelines that provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and

integrity of information disseminated by the agency, the plain language of the legislation fails to define these terms. 44 U.S.C. § 3516. Moreover, the history of the legislation fails to provide any indication as to the scope of these terms. Absent any "meaningful standard" against which to evaluate the agency's discretion, the Court finds that Congress did not intend the IQA to provide a private cause of action, and therefore Blaske Marine Plaintiffs' IQA claim fails.

## CONCLUSION

"Man cannot exercise control over the weather." S. Doc. No. 78–191, at 17 (1944). In an attempt to control the effects of the weather, Congress enabled government agencies to regulate the operation of the Missouri River. In a perfect world, such regulation would adequately provide for all competing river interests regardless of the weather, while simultaneously protecting and preserving the environment and the species it harbors. The Corps and its corresponding government agencies have the insurmountable task to achieve this illusory perfection.

The Court commends the parties for vigorously advocating their positions. However, it is for this reason that Congress delegated Missouri River operations to the Corps. The Missouri River cannot be operated in a vacuum, but rather the Corps must consider, evaluate, and balance all interests in its operation of the Missouri River. This obligation is further compounded by the uncertainty of the weather and its unpredictable effect on river conditions. It is inevitable that the Corps' decisions will not be perfect, as evidenced by this extensive litigation. But, the "standard for agency action is not one of perfection." *Central South Dakota Co-op. Grazing Dist. v. Dep't of Agric.*, 266 F.3d 889, 901 (8th Cir.2001).

Moreover, a guiding principle behind the APA is to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 124 S.Ct. 2373, 2381, 159 L.Ed.2d 137 (2004). While the Court acknowledges the competing interests of the parties, the Court finds that the Federal Defendants have not acted arbitrarily and capriciously throughout their development of the 2004 Master Manual and 2004 AOP. Therefore, the 2004 Master Manual and 2004 AOP are valid, and the Corps must operate the Missouri River accordingly.

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

A. Federal Defendants' Motion for Summary Judgment on FCA and NEPA Claims (Clerk Doc. No. 245) is **GRANTED**;

B. Federal Defendants Motion for Summary Judgment on ESA Claims (Clerk Doc No. 242) is **GRANTED**;

C. Federal Defendants' Motion for Summary Judgment on Blaske Marine Plaintiffs' Collateral Claims (Clerk Doc. No. 252) is **GRANTED**;

D. Federal Defendants' Motion for Summary Judgment on the Claims by the Mandan, Hidasta and Arikara Nation (Clerk Doc. No. 339) is **GRANTED**; and

E. All other pending Motions are **DENIED** as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**